sorry this case is number 2160320 Pinkston v. Kuiper and I will say to you gentlemen in case you probably didn't hear it that I'm giving you five minutes running room without questions from the panel because of the peculiarities of the zoom argument so we'll hear first from The due process clause does not guarantee a prisoner the right to a pre-deprivation hearing before receiving a one-time dose of psychotropic medication against his will when a medical provider exercising professional judgment determines that the prisoner's mental health condition presents an imminent danger to himself or others. Washington v. Harper does not confer such a right in emergency circumstances. No decision of this court confers such a right and the en banc Fourth Circuit after considering Harper's rationale and context and noting the impracticalities of such a regime has held that no such pre-deprivation process is due in these type of emergency circumstances. The district court erred by extending Harper's pre-deprivation hearing requirement to the decision that affords no deference to the medical judgment of a prisoner's health care providers and makes doctors personally liable for real-time judgment calls if years later and after a full evidentiary hearing a reviewing court simply disagrees with the judgment. The appellate Dr. Kuiper asked this court to reverse the district court's decision, render a decision in his favor, and announce a clear and constitutionally sound rule governing involuntary medication in emergency circumstances. And the rule that we propose, which comes straight away from Hogan v. Carter, the Fourth Circuit en banc decision, is that in a case of a single emergency dose of psychotropic medication is distinguished from Harper's long-term involuntary treatment, a prisoner's adequately protected when a medical professional familiar with his condition orders involuntary medication consistent with accepted standards of medical practice to prevent harm, imminent harm, to the inmate himself or to others. Under that standard as applied by the Fourth Circuit, pre-deprivation process is not required, but prisoners are always protected from arbitrary decisions to medicate that substantially depart from accepted professional judgment. I welcome the court's questions. Well, that sounds like a negligent standard to me. Well, Judge Jones, it's not a negligent standard, and it shouldn't be. The standard is a deferential one. I would liken it to arbitrary and capricious, or after this. Well, it's more like the traditional standard for medical malpractice, right? Deviation from accepted standard of care? Yes, but it's reviewed through the lens of deference to the medical judgment made. So yes, Your Honor, if you had a expert witness on the side of the plaintiff who appeared and said, I've reviewed the decision, I've reviewed the circumstances, and I think in my professional medical opinion, this is a substantial departure from reasonable medical practice, then perhaps you might have a fact question. But under the proper standard, as defined by Hogan v. Carter of the Fourth Circuit, the question is not whether the court, in hindsight, would select a different course, but whether the doctor who had to make the real-time judgment in the difficult circumstances of a prison setting and safety issues associated with the inmate's conduct made one of any range of professionally appropriate decisions. Well, why doesn't the Eighth – why is this any different from the typical inadequate medical care case under, what is it, Whitley v. Albers, deliberate indifference? Why isn't it the Eighth Amendment standard? Because this decision embodied both medical care and discipline, and to the extent it's always a deliberate indifference, to the extent it's medical care it's deliberate indifference, I think you're arguing for less than your client deserves. Well, Judge Jones, I appreciate that point, and I certainly don't intend to, and we do think, looking at this court's precedents, that while we don't disagree under Washington v. Harper that this is a due process analysis, we do think, under this court's precedents, that in the prison setting, the due process standards ought to be aligned as closely as possible with the Eighth Amendment deliberate indifference standards. And under the Eighth Amendment, as you were just saying, Judge Jones, it is a very high deliberate indifference standard, essentially akin to criminal recklessness, and that's certainly not present in this case. I mean, if you look at the facts that Dr. Kuyper was confronting, an inmate who for three hours had been extremely agitated, kicking and banging on his cell, had not been susceptible to verbal interventions by nurses and other staff, was agitating an entire ward of inmates who suffered from mental illnesses themselves, and Dr. Kuyper arrives on the scene, assesses Mr. Pinkston personally, attempts to calm him down through verbal interventions unsuccessfully, and only after all of that makes the determination in the moment that involuntary medication, a single dose, a safe dose of Haldol, short-lived antipsychotic medication, was the appropriate treatment. And there's nothing in the record, there's no finding by the district court, that that was a deviation from sound medical judgment, much less deliberate indifference. By the way, I have a background question. I realized there was some kind of enormous upheaval in the provision of medical or psychiatric care to the Mississippi inmates, and whoever was the head of that was kicked out two or three years ago and replaced, charged, you know, criminal charges were brought against him. Was Dr. Kuyper involved in that change of management that you know of? So, Your Honor, I think you're referring to Commissioner Chris Epps, who was the former Commissioner of Corrections, and he was, you're absolutely right, he was caught up in a bribery scandal and was ultimately convicted of accepting bribes in exchange for directing contracts to certain contractors. Dr. Kuyper was not involved in that at all. He arrived at the facility in 2016, is what his testimony says, which was under Centurion Correctional Health Care, which was a provider that was hired through a public bid process. Okay, that's all I was interested in. Yes. Well, let me ask you another question. Suppose that in order to disable Pinkston from going forward with his actions, the prison guards had just gone in and tased him, right? Is that, is that, that would be a different scenario constitutionally, right? According to you, that would clearly be Eighth Amendment, correct? That would clearly be Eighth Amendment, Your Honor, and I think that's an excellent point because if guards had entered the cell and engaged in a use of force to subdue Mr. Pinkston, we would be under the Eighth Amendment, and it would be a question of, you know, qualified immunity in that case, as well as the excessive force, the heavy burden that you have to show. But that's the exact, if Mr. Pinkston's rule is adopted or prevails, that's exactly the type of scenario that prisons would be confronting, because you would put doctors on unsound footing when a mentally ill inmate is manifesting his condition in such a way that he's presenting a risk of harm to himself or others, rather than a medical intervention through involuntary medication, the doctor would have to decide, if I make this call, I may be subjected to liability three years after the fact, because a district judge disagrees with my decision, so I'm going to defer to security. And then as you said, security does not have, I'm sorry, Your Honor, security does not, security does not have the same training, experience, and abilities as a medical professional to make the judgment. So under the correct standard, again, as announced in Hogan v. Carter, which is the only clearly on-point precedent that we found, and it is a proper application of both Washington v. Harper and the Supreme Court's decision, Youngberg v. Romeo, which involved a person committed to a state hospital, not a prisoner, but the core teaching of both of those cases is deference to the professional judgment of medical professionals who were treating either the committed person  The district court's decision runs afoul of that core teaching, because what it does is substitute the court's judgment years after the fact as to whether there existed an emergency circumstance created by the inmate's mental illness that presented an imminent threat of harm. That type of medical judgment should be deferred to unless, and we do agree that there is liability if there is an arbitrary decision to medicate, a decision that is not an exercise of medical judgment or is such a substantial departure that it could be characterized as arbitrary or irrational, but if the doctor's decision under the facts presented falls within the range of appropriate medical responses, then we do not believe under the due process clause that it can be subjected to a constitutional section 1983 claim. Under the correct legal standard, again Hogan v. Carter, we think Dr. Kuyper clearly prevails. Again, there's no testimony from any medical professional that Dr. Kuyper's decision deviated in any way from sound medical judgment. Are you familiar with a Fifth Circuit case, Austin v. Johnson, 328 F. 3rd 204? I'm not sure. I'm not sure I am, Your Honor. Okay, well, you might take a look at footnote 10 in that case that allegedly says that it's not due process but the Eighth Amendment that determines a prisoner's bodily integrity claim. Well, I will take a look at that case, and I think that sounds like the similar argument to what we argued in our briefs, and that is if this is a due process claim and Washington v. Harper seems to say it is, then it ought to be as closely aligned to the Eighth Amendment as possible so that you don't have diverging standards like, Judge Jones, you've been discussing, and you have the traditional protections for a medical professional operating in the difficult circumstances of a correctional environment having to make decisions about based not just on the inmate's individual medical condition but safety and security concerns for the prison and the health and welfare of other inmates in the vicinity. Okay, well, I gather we don't have any more questions, so we'll, at this point, you have a chance for rebuttal. We'll turn it over to Mr. Salinas. Thank you, Your Honor. Good morning, and may it please the Court. Andre Salinas on behalf of the appellee, Chas Pinkston. The Supreme Court ruled in Harper and then reaffirmed in Riggins v. Nevada and in Sell v. United States that forceful injection of anti-psychotic drugs is a substantial invasion of liberty. These drugs alter the chemical balance in a patient's brain, change his or her cognitive processes, and carry the risk of serious, even fatal, side effects. Forcible injection is therefore impermissible unless it is both in the prisoner's medical interests and he is dangerous to himself or others. Applying that standard, the District Court in this case held, based on a four-day evidentiary hearing and well-supported factual and credibility findings, that the circumstances did not warrant forcibly injecting Mr. Pinkston with anti-psychotic drugs against his will. Dr. Kuyper's principal response is to propose a novel standard that would essentially give prison personnel free reign to forcibly inject inmates with anti-psychotic drugs so long as it is outside the context of recurring treatment. Such a regime would effectively destroy the constitutional right recognized in Harper, Riggins, and Sell. This Court should reject it. Mr. Bentley stated in his presentation that Dr. Kuyper made a determination of dangerousness, but there is no contemporaneous evidence here that Dr. Kuyper made such a determination, as opposed to one that Mr. Pinkston was simply being loud and disruptive, which is not the same thing. All we have is Dr. Kuyper's retrospective assertion during this litigation, and the District Court did not find his testimony credible because it was contradictory and the product of extensive leading questions from his attorney. That kind of credibility determination can virtually never be reversible error. On top of that, even had Dr. Kuyper made a determination of dangerousness, and again, there is no record that he did, the District's Court was well within its province to find insufficient evidence to support such a the trial court, including on the issue of whether the individual constituted a likelihood of serious harm to others. That's footnotes 11 and 12 of the Harper opinion. The question for this court. My problem. Sorry. Sorry. I'll proceed, Your Honor. No, I apologize. Yes. I apologize for interrupting. I was just going to say, Your Honor, the question for this court is whether the District Court's assessment of those facts was clearly erroneous. It was not. Mr. Pinkston had no history of violence toward others or himself. He was not violent toward anyone on the day in question, and although he made threatening comments, he was locked in his cell alone throughout the duration of the events at issue, unable to act on any of those threats, even assuming they were genuine and not facetious. At this time, I welcome the court's questions. Well, I'm sorry I interrupted you. My understanding is that Justice Stevens dissented in Harper and said the court was not deciding about the emergency use of antipsychotic drugs. Justice Stevens was saying in dissent that the procedures that the state of Washington employed in that case were not at issue. I don't think he was saying that prisoners did not have a liberty interest in that case, and I think any doubt about that was alleviated in Riggins two years later and then in Sell, which was from 2003. Well, what you were talking about in both of those cases was the long-term extended prescription of antipsychotic drugs, correct? That's correct, Your Honor. And this is a single use. What differentiates this from a taser? Well, it's a forcible injection of a foreign substance into the individual's body with the intent of changing the chemistry of his brain, altering thought process, and then it carries the risk of side effects that, as I'm aware, are not present with the taser, but I'm not sure about that. Well, a taser is a forcible injection of electricity into a person's body. Suppose the guards had gone in there and given him a cloth full of chloroform. Would Harper apply? Your Honor, I don't know the specific chemical nature of chloroform. Certainly, Harper applies to any substance that has the effect of altering an individual's brain chemistry and thought process. Where is your evidence that a single dose administered in this alters, you know, fundamentally alters a person's brain chemistry as opposed to sustained use? I would point, Your Honor, to Harper itself, which makes those statements without reference to long-term use of these drugs. I would also point, Your Honor, to the brief of the American Psychological Association in Harper, which acknowledges that the risk of side effects increases with longer-term use, but the risk of side effects is present with even one injection. Well, there's a risk of side effects with a COVID injection, but of course we don't administer those for discipline. And, you know, are you familiar with this court's decision in Austin v. Johnson that I mentioned to opposing counsel? I am not, Your Honor. I apologize. And I believe the district court didn't cite it, so it's something you both ought to look, take a look at. What do you do with the principle that where you have a, you're saying that there's an independent due process claim here, but what do you do with the idea that the Supreme Court has often expressed that where there's an explicit provision of the Constitution textually available, we don't go to the, what some consider the vaguer words of the 14th Amendment? Your Honor, Harper and then Riggins and Sell make very clear that the due process clause is implicated in this case because of the unique nature of antipsychotic medication. I would also, you know, respectfully, I don't believe Dr. Kuyper cites a disciplinary use for use of this medication, and I don't think that's a proper way of considering his purpose here to the extent he had one. Now, Harper establishes a liberty interest, a constitutional right to avoid this medication unless the inmate is dangerous to himself or others. Now, when the medication is administered, that is not a disciplinary function. The purpose is to mitigate the danger. And so the question in this case is whether Mr. Pinkston was dangerous at the time he was injected, and the district court probably found that the answer was no, that the better way of characterizing his behavior was that it was loud and disruptive, but loud disruptions do not justify, I'm sorry, I apologize, loud disruptions do not justify the use of this medication. Harper makes that patently clear. And so the 8th Amendment is not implicated in part because there's a unique liberty interest, but also because it's not a disciplinary purpose. Harper's framework speaks to this case, and the fact that this was an ad hoc, unplanned injection does not render the liberty interest inapplicable. And in fact- Suppose instead of what happened in this case, suppose that Dr. Kuyper heard, so he was a floor away when you characterize it as disturbance, apparently it was significant enough and the incitement to the other inmates was significant enough that Dr. Kuyper could hear it from a floor away in the prison. So he comes to the cell to investigate and he looks at it and he's like, you know what, Mr. Pinkston is locked up and he's isolated and he's alone in his cell, let's just leave him there. And then heaven forbid, something happens. I mean, he has a, the psychotic break is worse and he either hurts himself or has a cardiac event or something, and he dies or is seriously injured in his cell. What would be the nature of the claim that Wilmer Hale would bring on behalf of Mr. Pinkston in that circumstance? In a case where they left him alone completely, I don't know Wilmer Hale would bring, I imagine attorneys may look at a deliberate indifference claim. Can I pause you on that for a second? Can I just pause real quick before we even go on past the hypothetical? Because you're 100% correct. We see these cases all the time and they're tragic and sad, but people get hurt in prison, they hurt themselves, things happen, they have acute medical events. And when people don't act fast enough, it's a deliberate indifference claim. It has been since Estelle versus Gamble, that's been around for almost 50 years now, that it sounds in the Eighth Amendment. So why would the medical judgment not to intervene sound in the Eighth Amendment, but the medical judgment to intervene sounds in something other than the Eighth Amendment? Because the particular kind of intervention in this case, Your Honor, is a unique one that the Supreme Court has recognized time and time again. And so it involves the injection of a foreign substance into the individual's body with the intention of altering the way the individual's mind works. But if I can just go and take a step back, Your Honor, and I understand the nature of hypothetical, but this unit that Mr. Pinkston was in at the time of these events was one designed so that he could be closely observed. And so the idea that he would be, that the only alternative in this situation was to leave him alone entirely unobserved, I don't think is an accurate one. And so in a case where the medical judgment was made to observe him closely to see if the situation escalated, that would not be a deliberate indifference claim. A situation where they decided, and I understand that this happens quite often, a situation where they decide to temporarily separate him from the rest of the ward, that would not be a deliberate indifference claim. And so I do believe there's an ample, there's ample space here for medical professionals to make determinations. And so I don't think you're concerned about running up against the is well suited to these facts, at least certainly. So I understand there was really no trial in this case. There were just a series of these evidentiary hearings over the course of a couple of months. So I'm not sure even really what the, how to procedurally situate this particular question, but what would be the evidence? I would say, what would be the evidence at trial, although there's no trial? So what would be the evidence of the evidentiary hearing that suggests that this was not a good exercise of Dr. Kuiper's medical judgment? Mr. Pinkston, and it was a, it was a, what we call a flowers evidentiary hearing, which this court has assumed is the equivalent of a bench trial. Over the course of those four days, it was, testimony was repeatedly elicited that Mr. Pinkston was in his cell alone during the duration of the events in question. So that is an important fact. There is also the important fact that Mr. Pinkston had a history of being argumentative, combative, disrespectful, sarcastic, but that conduct had never risen to the level of violence. And he did not attempt to be violent with anybody on the day in question. Dr. Kuiper admitted that. And so I think all of that evidence suggests that this was a decision that was made at a minimum, far prematurely, and that Mr. Pinkston could have been separated. He could have been observed closely, but to inject him within minutes of observing him with medicine that is designed to change the way his brain works and carries a risk of serious side effects, the Supreme Court has made very clear that that is not permissible. And I also want to make, and I see that I have about six minutes left, I also want to make clear for the court that even if this court determines that the use of the forcible injection of these drugs was substantively justified, that still leaves the matter of procedural due process. And the parties agree, it is undisputed that he received no pre-deprivation process whatsoever in this case. And so Harper may not speak to that directly, but how do you give pre-deprivation process to somebody who is, I understood the fact here, had been yelling and screaming for four hours and Mr. Kuiper did, Dr. Kuiper did attempt to talk him out of it before he ordered the administration of Haldol. Your Honor, I will give you three procedural protections that I think Mr. Pinkston was entitled to in these circumstances and easily could have received. The first is notice of Dr. Kuiper's preliminary decision to inject medication and a meaningful opportunity to respond and be heard on that decision. He did not receive that here, that is undisputed. Second, he was entitled to a finding of dangerousness and contemporaneous evidence of the basis of that finding. That record does not need to be hundreds of pages, but there surely should be something in the record indicating why Dr. Kuiper judged him to be dangerous. That is not here. And then the third is on this record where there's no evidence of an immediate risk to grave harm. Mr. Pinkston was entitled to an independent decision maker like that identified in Harper. That doesn't need to be, you know, he doesn't need to be moved to a hearing room where independent decision makers sit on a but he is entitled to an independent medical decision maker who can properly balance his liberty interests in refusing the drugs and the institutional interests at issue. Dr. Kuiper acknowledges that he was not an independent decision maker because he was his day-to-day treating one of Mr. Pinkston's day-to-day treating physicians. I'll add normally we give more weight to a treating physician than an expert who has only read a file. Just for the sake of argument. I take that point, Your Honor. Dr. Kuiper, I would again make the point that there is no contemporaneous evidence that Dr. Kuiper even made a finding here. Well, you don't think, you don't think it's, I mean, again, you know, the district court apparently saw it otherwise, but he tried to talk him down. That's undisputed, correct? That is correct, but that is not the same as providing him notice of the decision. Isn't the implicit corollary to that that he decided this was, that was an ineffective mode of control? I don't know if that's correct or not, Your Honor. I think that's probably... Does the doctor have to go through some step grievance saying, well, I couldn't talk him down, so maybe I can threaten him with not having dinner, or maybe I can threaten him with taking him out, you know, somewhere behind the woodshed, or maybe I can threaten him with paging it. I mean, just, you know, what has to be there? It is not a rigid process, Judge Jones, but I will say that the saying to someone settle down is fundamentally different than providing them notice that you are about to inject antipsychotic drugs into their system. And to your point about whether this is unreasonable, I would just point, Your Honor, to pages 4,116 through 4,118 of the record, which is the Centurion's guidelines for this type of situation, Centurion being Dr. Kuyper's employer at the time. They required that prior to administration of the drugs, the mental health or medical staff will attempt to obtain voluntary compliance from the patient. That implicitly requires notice of what you're going to do. Medication will be initially offered to the patient in oral form. Whenever possible, liquid medication will be used. Only when the patient refuses to accept oral medication will the medication be administered intramuscularly. And so that is a form of notice right there. Now, on the contemporaneous record point, that was at page 4,118. On the contemporaneous record aspect of this, 4,116 requires the ordering physician to document the patient's condition, the threat posed, the reason for forcing the medication, other treatment modalities attempted, modalities attempted, if any, and treatment plan goals for less restrictive treatment alternatives as soon as possible. And so all of that is process that Mr. Kingston did not receive here. Now, whether that all rises to the constitutional level, I acknowledge that it is different. But I think there is adequate basis on these facts to say that Mr. Kingston could have and should have and was required to receive under the Constitution notice of this decision, a meaningful opportunity to respond, a contemporaneous finding of dangerousness, and evidence and at least documented bases for that determination. I thank the court for its and that is that the, according to the briefing, Mr. Kingston is quite a manipulator. And he apparently engaged in some fake hunger strikes before he was moved to this mental ward. And he obviously attempted to get another prisoner to lie for him when that fellow was brought in. And his fakery was significant enough that the district court found absolutely no damages, nominal damages here. My question is about your law firm's policy. What is so, why does the law firm think it is worthwhile to use a case on behalf of a liar and faker, who may well have been faking even his what was going on in the in his prison cell that day, to make what would be a very, very significant rule of constitutional law? You know, this isn't Mr. Miranda, who was being forced to testify against himself. It's not Mr. Gideon who lacked counsel. This is a guy who's incarcerated for a long term, evidently has problems. I don't dispute that. But he's not under long term medication. This is a single incident. And yet you fellows are trying to blow it up into a constitutional case. Your Honor, I dispute the notion that, that Mr. Kingston is properly characterized as a liar and a faker. And I don't think that the supports that notion. On what the decision that our law firm made, I would just say that there's a judgment below that we're defending. We believe that regardless of the crimes that Mr. Kingston committed, his liberty interest has value. The Supreme Court has recognized that he has a substantial liberty interest in refusing this medication. And I would leave it with that. Thank you. All right, sir. Thank you. Mr. Bentley. You're on mute. Thank you, Your Honor. A few quick points, if I can. I want to start with the dilemma that's proposed by Mr. Kingston's regime, which was explored in questioning by Judge Oldham. If Dr. to call Mr. Kingston through an involuntary injection, then the odds are he will not, or he'll defer, he'll pause, and even greater harm could occur. And then that suit would most certainly be brought by Mr. Kingston under the deliberate indifference standard. A search of Westlaw and Pacer shows that Chas Kingston is a frequent filer of deliberate indifference cases. That is certainly a real possibility here. The other thing I want to note is the type of process that Mr. Kingston's counsel was describing. First of all, he said notice and a meaningful opportunity to respond. Nurse Barron's testimony confirms that Dr. Kuyper, in attempting to calm Mr. Kingston, also advised him that if he could not calm down voluntarily, he would have to be I don't have to do what you say. So there is certainly evidence in the record that he received notice of Dr. Kuyper's medical judgment decision that he would need to be medicated. This suggestion that Dr. Kuyper needed to make some sort of record or findings to support his real-time medical judgment I think is misplaced. If you look at even the district court's recitation, you don't even Dr. Kuyper's testimony shows that in Dr. Kuyper's view, Kingston was, quote, completely out of control in a state where he could endanger his own health and welfare to get whatever he wanted. Kingston stirred up other inmates. Dr. Kuyper genuinely believed, whether the district court disagreed with it or not, he genuinely believed that Kingston could flood his cell, causing an evacuation of the entire ward. The district court's hindsight disagreement with these judgment calls by Dr. Kuyper doesn't mean that he departed from professional standards of medical judgment. There's no evidence in the record to suggest such a departure. All the evidence confirms that Dr. Kuyper acted in what he thought, in that moment, was the best interest of his patient, Mr. Kingston, and the other inmates on the psychiatric ward that had mental illnesses and were clearly agitated and becoming further agitated by Mr. Kingston's conduct. We ask that the court reverse and render a decision in Dr. Kuyper's favor. All right, sir. Thank you. Thank you, Your Honors.